IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 26, 2014

**JASON OSMOND HINES v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Hamilton County**
**No. 284772    Honorable Don W. Poole, Judge**

---

**No. E2013-01870-CCA-R3-PC - Filed April 21, 2014**

---

The Petitioner, Jason Osmond Hines, appeals the post-conviction court's denial of relief for his conviction of second-degree murder. On appeal, the Petitioner argues that he received ineffective assistance of counsel based on counsel's failure to properly impeach the State's witnesses and adequately present a theory of self-defense. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JEFFREY S. BIVINS and ROGER A. PAGE, JJ., joined.

Yolanda E. Mitchell, Chattanooga, Tennessee,  for the Petitioner, Jason Osmond Hines.

Robert E. Cooper, Jr., Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; William H. Cox, III, District Attorney General; and Cynthia Lecroy-Schemel, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

This appeal arises out of the shooting death of Terrell Harris on September 9, 2007. The Petitioner was implicated in the shooting and subsequently indicted for first-degree murder, felony murder, and especially aggravated robbery. The underlying facts were summarized by this court on direct appeal, in relevant part, as follows:

On the evening of September 9, 2007, Mr. Lovell Lightner was at his mother's house at 3308 3rd Avenue, Chattanooga[, Tennessee]. He saw [the Petitioner] ride up the street on a bicycle . . . and began talking to him. According to Mr. Lightner, [the Petitioner] told him that [the Petitioner] had

come to the area to rob a white person. [The Petitioner] lifted up his shirt and showed Mr. Lightner "something like a big old automatic, like a .44, 9mm, or .45."

Mr. Lightner saw Keosha Byrd and [the victim] drive down the street. [The victim] stopped the car and spoke with [the Petitioner]. The victim asked [the Petitioner] whether he had the forty dollars that he owed him. [The Petitioner] responded that he had the money. The victim drove up the street and turned around. He parked in front of Ms. Byrd's uncle's house. [The Petitioner] parked his bicycle in Mr. Lightner's mother's driveway and got into the back seat of the victim's car.

Mr. Lightner began to walk towards his mother's house. He heard a gunshot and turned around. He saw Ms. Byrd jump out of the car and run up to the door of 3303 3rd Avenue. He could see the victim and [the Petitioner] struggling inside the car. He heard a second shot. He saw [the Petitioner] jump out of the car and run away.

Mr. Lightner ran to his mother's house yelling for her to call 911. At the same time, Ms. Byrd ran to 3303 3rd Avenue beating the door to get into the house. He saw the victim get out of the car and stagger around walking like a "zombie." He saw the victim go to Ms. Watkins's house, at 330[3] 3rd Avenue, and knock on the door. When he was not let into the house, the victim went back to the sidewalk and sat down and did not get up again.

Marquita Watkins lives at 3303 3rd Avenue. She stated at trial that she saw [the Petitioner] and Mr. Lightner talking. She was on her porch and heard [the Petitioner] tell Mr. Lightner that he was in the area to rob someone. Shortly thereafter, she saw Ms. Byrd and the victim drive up in their car. She saw [the Petitioner] speaking to the victim while the victim was in the car. She saw the victim drive up the street, turn around, and come back and park on her side of the street. Ms. Watkins saw [the Petitioner] get into the back seat of the victim's car. She saw a "flash of light inside the car" and heard a gunshot. Ms. Watkins saw Ms. Byrd get out of the car and run up to her house. She let Ms. Byrd into the house, and they called 911.

She looked back out the window and saw [the Petitioner] still in the car bending over to the front seat of the car by the victim. Ms. Watkins saw [the Petitioner] jump out of the car, carrying something in his hand, and run away from the scene. After [the Petitioner] ran away, the victim got out of the car

and came up to Ms. Watkins's porch. She did not let him into the house. The victim walked back to his car and sat down. However, the victim could not talk because when he tried "a big bubble of blood would come out of his mouth and bust all over his face."

Ms. Byrd stated that the victim had been her boyfriend. On the date in question, Ms. Byrd and the victim were driving on 3rd Avenue when they saw [the Petitioner]. According to Ms. Byrd, [the Petitioner] flagged them down and told the victim he wanted to buy some crack cocaine. The victim told him that they would be "back around" because they had to drop a friend off at a house up the street.

Ms. Byrd testified that the victim had been selling cocaine that day and that he had over $1,000 in his possession. They returned to [the Petitioner] and parked in front of Ms. Watkins's house. [The Petitioner] got in the backseat behind the victim. The victim said something that made Ms. Byrd turn around and look at him. When she did that, she saw [the Petitioner] pulling a gun from his waistband. [The Petitioner] was pointing the gun toward the victim's face or neck. When Ms. Byrd saw the victim trying to get out of the car, she got out and ran to Ms. Watkins's house.

Ms. Byrd saw the victim get out of the car. She said he came to her friend's house. When he returned to the car, he fell on the ground. Ms. Watkins and her boyfriend went to check on the victim by the car. Ms. Byrd said she did not see anyone take anything from the car. She also denied that the victim had a gun the night of the incident. Ms. Byrd gave a statement to officers when they arrived, and she identified [the Petitioner] in a photographic lineup immediately when she was shown the photographs.

. . . .

[The Petitioner] also testified at trial. He stated that he arrived on 3rd Avenue and found Mr. Lightner. He spoke with Mr. Lightner about buying some crack cocaine. He saw the victim, whom he knew from serving time in jail together. The victim said that he would sell him some cocaine but needed to take a friend home who was in the backseat of the car. When the victim returned, [the Petitioner] tried to give the victim $40, but the victim told [the Petitioner] he needed to get into the car.

[The Petitioner] got into the backseat of the car. He placed his $40 on the console. According to [the Petitioner], the victim grabbed the money and started arguing with him about [the Petitioner]'s owing him money from a prior drug deal. [The Petitioner] told the victim he needed to give him his money back or give him some cocaine. According to [the Petitioner], the victim pointed a gun at him and demanded the rest of the money [the Petitioner] owed him. [The Petitioner] testified that they began to argue and struggle with each other to gain control of the gun. [The Petitioner] thinks that during the struggle his finger hit the trigger and caused the victim to accidentally shoot himself. He stated that he got scared when the victim was shot and ran away.

State v. Jason Osmond Hines, No. E2010-01021-CCA-R3-CD, 2011 WL 5966910, at *1-3 (Tenn. Crim. App. Nov. 30, 2011), perm. app. denied (Tenn. 2012).

Following trial, the jury convicted the Petitioner of two counts of second degree murder as lesser included offenses of the first degree murder charges and of aggravated assault as a lesser included offense of attempted especially aggravated robbery. The trial court merged the three convictions into the second degree murder conviction and sentenced the Petitioner to an effective sentence of 22 years. This court affirmed the judgment of the trial court on direct appeal. Id., 2011 WL 5966910, at *12.

On August 12, 2012, the Petitioner filed a timely pro se petition for post-conviction relief. He was subsequently appointed counsel, and an amended petition was filed on November 9, 2012. At the June 24, 2013 post-conviction hearing, counsel testified that he was appointed to represent the Petitioner during the preliminary hearing stage of the Petitioner's case and continued to represent him throughout the Petitioner's trial. He acknowledged that the Petitioner's case was his first felony murder trial. Counsel met with the Petitioner at least 26 times prior to trial to discuss the evidence and possible defense strategies. The Petitioner told counsel that on the evening of the shooting he tried to purchase cocaine from the victim, but the victim pulled out a gun and demanded more money for a past drug debt. The Petitioner claimed that they struggled over the gun before it "went off killing [the victim]."

The Petitioner and counsel "obviously" talked about self-defense as a possible defense theory; however, counsel wanted to "wait to see how the evidence turn[ed] out" before determining which defense to argue to the jury. Counsel explained that he decided not to request a self-defense jury instruction after discussing it with the State and trial court and learning that self-defense is inapplicable where the defendant is engaged in illegal activity. He stated that he reviewed the self-defense jury instruction numerous times before trial but

was unaware of the language in the self-defense jury instruction regarding illegal activity because he was either "looking at an older book or [he] just misread it." He acknowledged, however, that his "biggest regret" was not arguing for a self-defense instruction to preserve the issue for appellate purposes.

Prior to trial, the Petitioner filed a complaint with the Board of Professional Responsibility and a motion with the trial court in an attempt to have trial counsel relieved as counsel. Counsel did not believe that the complaints were "personal" or that it hindered his abilities to represent the Petitioner. At the hearing on the Petitioner's motion, the Petitioner told the court that counsel was "a good lawyer" but expressed concern about counsel's handling of the Petitioner's bond hearing. Based on the Petitioner's statements at the hearing, the court denied the Petitioner's motion.

Counsel agreed that he had difficultly impeaching some of the State's witnesses during the trial, but he believed that he conveyed his points to the jury. For example, he agreed that Ms. Watkins's testimony at trial varied from what she initially told the 911 dispatcher and police on the night of the incident. However, counsel did not play the 911 recording for the jury or call the detective that interviewed Ms. Watkins to impeach her testimony at trial. He explained that "at the time of trial, [he] probably felt that cross-examination was effective enough, that therefore, [he] did not need to call the [the other witnesses to impeach her]." He also believed that he elicited favorable testimony from Mr. Lightner, the State's "key witness." He recalled that Mr. Lightner testified that the victim "pulled [a gun] on him one time" prior to the incident. He also opined that the jury did not accredit Mr. Lightner's version of events because they did not convict the Petitioner of the robbery offense. Counsel recalled that at the close of the State's case-in-chief, he made a motion for judgment of acquittal in front of the jury. The trial court interrupted his motion to allow the jury to leave, and counsel continued his argument out of the presence of the jury. Counsel did not make a detailed argument on the motion, and the motion was denied by the trial court.

Counsel recalled that the Petitioner wanted to testify to "put forth what happened in his own words." Counsel discussed the pros and cons of testifying with the Petitioner, and the Petitioner ultimately chose to testify. In closing argument, counsel did not make a self-defense argument because he did not believe that the Petitioner was entitled to the instruction. Instead, he attempted to argue that the State failed to prove their case beyond a reasonable doubt. He argued that it "wasn't a robbery because [the Petitioner] left the money there . . . and by extension it wasn't felony murder." He also argued that the State failed to prove premeditation for first degree murder by arguing the facts of the case, namely that "the gun came out, there was a struggle over it and that the gun went off[.]" Counsel agreed that his representation of the Petitioner was "inartful," but he believed he was effective because

"the jury came back with a lesser offense of second degree murder . . . . and aggravated assault[.]"

Appellate counsel testified that she became involved in the Petitioner's case after his trial because counsel got a job at the District Attorney's office and had to withdraw from his representation of the Petitioner. Appellate counsel handled the Petitioner's motion for a new trial and his direct appeal. She was familiar with the Petitioner's case prior to her appointment because her partner assisted counsel in his representation of the Petitioner at trial. She explained that her "hands were tied" on appeal with regard to the self-defense jury instruction issue because trial counsel waived the issue by failing to request the instruction or object to the State's comments during closing argument. She opined that the Petitioner's "only defense was self-defense/accidental discharge while operating under self-defense."

The Petitioner testified that he became concerned about counsel's representation prior to trial when counsel told the Petitioner he was not aware of "any possible defenses" to pursue in the Petitioner's case. The Petitioner researched case law and brought the self-defense and duress arguments to counsel's attention. Counsel informed the Petitioner that he did not have any prior experience with felony murder cases, and the Petitioner "polite[ly]" told counsel he did not want counsel representing him at trial. The Petitioner then filed a complaint with the Board of Professional Responsibility, after which counsel "finally [took] an interest" in the Petitioner's defense. The Petitioner also filed a motion to relieve counsel with the trial court but "felt forced to keep [counsel]" because he did not want "another inexperienced lawyer" who did not have time to prepare for trial.

The Petitioner recalled that counsel questioned the jury about self-defense during voir dire and his "whole impression during trial was that [he] was testifying in self-defense." He requested that counsel use the recording of Ms. Watkins's 911 call to impeach her testimony at trial but stated that counsel "brushed [him] off" and told the Petitioner he planned to discredit Ms. Watkins's testimony by calling Detective Bales. When Detective Bales was not available to testify at that time, trial counsel placed the Petitioner on the stand instead of waiting for Detective Bales. After the Petitioner finished testifying, counsel informed him that it was too late to call any more defense witnesses.

Counsel initially told the court that he wanted a self-defense jury instruction; however, after a brief recess, counsel abandoned his request. When the Petitioner questioned counsel about the self-defense instruction, counsel told the Petitioner that "the Judge told him to reconsider [the] defense and it was out of his hands." The Petitioner believed that he was entitled to a self-defense instruction and a duress instruction. On cross-examination, the Petitioner acknowledged that he got into the victim's car voluntarily to buy drugs and that he was not under duress at the time.

Following the post-conviction hearing, the court took the matter under advisement and issued a written order denying relief on July 22, 2013. In relevant part, the court made the following findings of fact and conclusions of law:

The Petitioner alleges that trial counsel was ineffective in requiring instruction from the judge in how to lay a foundation to impeach a witness on the basis of a prior, inconsistent statement, exhibiting obvious confusion during the cross-examination of Mr. Lightner, and not impeaching prosecution witnesses, including Mr. Lightner, despite Mr. Lightner's prior, grossly inconsistent statement to police. Counsel's failure to impeach Mr. Lightner and Ms. Watkins with their prior, inconsistent statements, only one of which is in the record, constitutes deficiency in counsel's performance. Mr. Lightner's and Ms. Watkins'[s] testimony that they heard the [P]etitioner say that he intended to rob "a white person" or "someone" and Ms. Watkins'[s] testimony that, after the shooting, the [P]etitioner did not immediately leave the vehicle but was apparently looking for something inside for a time were important on the issue of the [P]etitioner's intent.

There is, however, no reasonable probability that the deficiency in counsel's performance in these respects was prejudicial for several reasons. First, despite Mr. Lightner's and Ms. Watkins'[s] testimony about the [P]etitioner's stated intent to rob "a white person" or "someone", the jury did not convict the [P]etitioner of felony murder, presumably, because they did not believe it was his intent to rob the victim, who, presumably, was not a white person. Second, Mr. Lightner's and Ms. Watkins'[s] testimony about the [P]etitioner's stated intent to rob a "white person" or "someone" was not the only important evidence of the [P]etitioner's intent. Ms. Byrd's testimony that, when the victim, who was not armed with a gun, said something and she turned to look at him, she saw the [P]etitioner pulling a gun from his waistband was even more important because it identifies the [P]etitioner as the aggressor and clarifies the [P]etitioner's intent with respect to a specific person, the victim. Third, as counsel argued, the jury did have other reasons, the effect of Mr. Lightner's use of drugs on his ability to apprehend and remember events, Mr. Lightner's loquaciousness, Ms. Watkins'[s] failure to remember that it was dark, Ms. Byrd's preoccupation with her hair, and Ms. Byrd's addition of the gun-pulling detail, to question the eyewitnesses' testimony. Fourth, the [P]etitioner's own testimony gives him a motive to kill the victim unrelated to self-defense and related to debt or addiction. Fifth, there is no apparent dispute that the victim was in the driver's seat and the [P]etitioner was in the backseat, either on the driver's side or in the middle.

In addition, according to the medical examiner, at the time of the shooting, the victim was facing forward with his head slightly cocked. Thus, the [P]etitioner's trial testimony that the victim used a gun to threaten him in the backseat is incredible. Seventh, the [P]etitioner fled and hid. The Court therefore finds no prejudice in counsel's deficient performance in these respects.

. . . .

The [P]etitioner alleges that trial counsel was ineffective in not objecting to the omission of a jury instruction on self-defense, despite his testimony supporting the instruction.

. . . .

As the outcome in State v. Bledsoe, 226 S.W.3d 349 (Tenn. 2007) reflects, in cases in which there is evidence of a struggle in which the victim was the aggressor, it may be reasonable to argue accident, instead of self-defense.

. . . .

In any event, in this case, by his own account, the [P]etitioner entered the victim's vehicle to engage in illegal activity, the acquisition of drugs. The availability of the defense of self defense being and, at the time of the [P]etitioner's offenses, having been conditional on the non-engagement in an illegal activity, the Court finds no reasonable probability that any deficiency in counsel's performance in this respect was prejudicial.

. . . .

In conclusion, the Court notes that, despite counsel's inexperience and mistakes, counsel was successful in obtaining the [P]etitioner's acquittal on the charges of first-degree murder and especially aggravated robbery. The Court reiterates that it does not regard it as reasonably probable that, but for counsel's mistakes, the [P]etitioner would not have been convicted of second-degree murder or aggravated assault. Whatever Mr. Lightner's and Ms. Watkins'[s] prior, inconsistent statements, they were not in the vehicle at the time of the shooting. Ms. Byrd's account, however, is more credible than the [P]etitioner's account, which, except for his explanation of the outbreak of

violence, which gives him, more than the victim, reasons for aggression, is incredible for at least two reasons. First, it is the medical examiner's opinion that the victim was facing forward at the time of the shooting. Second, it is unlikely that the victim in the front seat would threaten the [P]etitioner in the back seat with a gun from a position in which the victim could not easily aim the weapon at the [P]etitioner or prevent the [P]etitioner from seizing the weapon and turning it against the victim. It is the incredibility of the [P]etitioner's account of the shooting that prevented his complete acquittal on a theory of accident. It is the same incredibility that, with the illegality of the [P]etitioner's drug activity, would have prevented his complete acquittal on a theory of self-defense.

It is from this order that the Petitioner now appeals.

## ANALYSIS

On appeal, the Petitioner argues that he received ineffective assistance of counsel based upon trial counsel's failure to properly impeach the State's witnesses and failure to adequately present a theory a self-defense.[1] The Petitioner further asserts that the post-conviction court applied an incorrect standard in determining whether the Petitioner suffered prejudice as a result of counsel's alleged deficiencies.[2] The State responds that the post-conviction court properly denied relief because the Petitioner failed to establish by clear and convincing evidence that he received ineffective assistance of counsel. We agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2006). The Tennessee Supreme Court has held:

---

[1] The Petitioner also asserts that counsel prematurely argued his motion for judgment of acquittal in front of the jury before being stopped by the trial court. He maintains that once the jury exited the court room, counsel continued to argue the motion but did not "make any actual argument" and instead simply stated that he did not believe there was any evidence of premeditated murder. The Petitioner failed to support this contention with argument, citation to authorities, or references the record. Therefore, we conclude that this ground is waived. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

[2] The Petitioner raised several additional grounds for relief in his petition for post-conviction relief, including an ineffective assistance of counsel claim against appellate counsel. The post-conviction court denied relief on these grounds, and the Petitioner did not raise them on appeal to this court. Therefore, we do not address them.

A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Goad, 938 S.W.2d at 370 (quoting Strickland, 466 U.S. at 694).

The Petitioner first asserts that counsel rendered ineffective assistance of counsel by failing to properly impeach the State's witnesses, namely Ms. Watkins and Mr. Lightner. The Petitioner argues that it "was crucial to [his] defense that Ms. Watkins['s] trial testimony be impeached because she testified in court to allegedly hearing [him] make statements regarding an intent to rob someone[,]" which contradicted her earlier statements to police. He maintains that counsel should have played the 911 recording or called witnesses to impeach her, and his failure to do so prejudiced the Petitioner's defense. In addition, the Petitioner asserts that Mr. Lightner "was the only witness who testified to the [Petitioner] allegedly having a gun the night of the incident." The Petitioner argues counsel should have undermined Mr. Lightner's credibility by eliciting testimony about Mr. Lightner's drug use on the night of the incident. He further maintains that Mr. Lightner previously told police that the victim was known to always carry a gun, which was evidence "essential to the [Petitioner]'s claim of self-defense." The post-conviction court agreed with the Petitioner that counsel's failure to impeach these two witnesses despite their prior, inconsistent statements constituted deficient performance. Notwithstanding this deficiency, however, the court concluded that the Petitioner failed to establish prejudice.

Citing to Edward Thomas Kendrick, III v. State, No. E2011-02367-CCA-R3-PC, 2013 WL 3306655 (Tenn. Crim. App. June 27, 2013), perm. app. granted (Tenn. Nov. 13, 2013), the Petitioner argues that the post-conviction court employed an incorrect standard in determining whether the Petitioner established prejudice. He notes that the prejudice analysis is not "an inquiry into the sufficiency of the evidence adduced at trial," id. at *16, and maintains that the reasons cited by the court to deny relief are "basically all arguments in regard to the sufficiency of the other evidence adduced at trial[.]" He argues that under the correct standard, he has established prejudice and is entitled to relief.

As stated above, prejudice is demonstrated by establishing "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Goad, 938 S.W.2d 363 at 370 (quoting Strickland, 466 U.S. at 694). The Petitioner correctly notes that the prejudice analysis is not "an inquiry into the sufficiency of

-11-

the evidence[.]" Edward Thomas Kendrick, III, 2013 WL 3306655, at *16 (citing Pylant v. State, 263 S.W.3d 854, 875 (Tenn. 2008)). Indeed, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Pylant, 263 S.W.3d at 875 (quoting Strickland, 466 U.S. at 694). Instead, "'a court making the prejudice inquiry must ask if the [petitioner] has met the burden of showing that the decision reached [by the jury] would *reasonably likely* have been different absent the errors." Pylant, 263 S.W.3d at 874 (quoting Strickland, 466 U.S. at 969) (emphasis added in Pylant).

In the present case, the post-conviction court concluded that despite counsel's inability to effectively impeach Mr. Lightner and Ms. Watkins, the Petitioner's defense was not prejudiced by this deficiency. Significantly, the court noted that the Petitioner was not convicted of especially aggravated robbery or felony murder, evidencing the jury's rejection of Mr. Lightner's and Ms. Watkins's testimony regarding the Petitioner's intent to rob someone. Additionally, the court emphasized that other evidence, such as the testimony of Ms. Byrd and the medical examiner, contradicted the Petitioner's version of events and theory of self-defense. Ms. Byrd, the only other witness in the car at the time of the altercation, testified that the Petitioner was the initial aggressor and pulled the gun from his waistband, which contradicted the Petitioner's testimony that the victim pulled the gun on him. Likewise, the medical examiner opined that the victim was facing forward at the time of the shooting, which contradicted the Petitioner's assertion that the gun accidently discharged during a struggle between the victim and the Petitioner. Although the post-conviction court references the other evidence adduced at trial, the court's analysis is not an inquiry into the sufficiency of the evidence. Rather, it is an inquiry into the probability that the jury's decision "would reasonably likely have been different absent the errors." See Pylant, 263 S.W.3d at 874. After considering all of the evidence, the court concluded that the Petitioner failed to establish that it was "reasonably probable that, but for counsel's mistakes, the [P]etitioner would not have been convicted of second-degree murder or aggravated assault." Upon review of the record, we agree with the post-conviction court that the Petitioner failed to meet his burden of establishing prejudice.

The Petitioner next contends that counsel rendered ineffective assistance of counsel by failing to adequately present a theory of self-defense or request a self-defense jury instruction.[3] The Petitioner maintains that he and counsel decided to pursue a self-defense

_____

[3] During closing argument, the prosecutor told the jury, "You heard [counsel] say in his opening statement, this is an issue of self-defense. You heard the testimony of [the Petitioner] that this is [a] self-defense issue . . . You are not going to receive an instruction about self-defense [from the judge]. It is not something the law allows you to consider in this case. It has not been fairly raised by the proof." In his brief
(continued...)

-12-

theory prior to trial but counsel abandoned their defense strategy during trial without consulting with the Petitioner, which prejudiced his defense. The post-conviction court did not specifically conclude whether counsel's conduct constituted deficient performance, but noted that "in cases in which there is evidence of a struggle in which the victim is the aggressor, it may be reasonable to argue accident, instead of self-defense." The court concluded, however, that notwithstanding counsel's alleged deficiencies, the Petitioner failed to establish prejudice. In reaching its conclusion, the court reasoned that the Petitioner admitted he entered the victim's car to purchase drugs, and therefore, was not entitled to a self-defense instruction, which is premised on the "non-engagement of illegal activity." Upon review of the record, we agree with the post-conviction court and conclude that counsel did not render ineffective assistance of counsel in this regard.

"The effective assistance of counsel necessarily requires counsel to 'conduct appropriate investigations, both factual and legal,' and to assert defenses 'in a proper and timely manner.'" Wiley, 183 S.W.3d 317, 331-32 (Tenn. 2006) (quoting Baxter, 523 S.W.2d at 932, 935). "In evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. Counsel's conduct must be "assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments." Burns, 6 S.W.3d at 462. However, we note that this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

At the time of the Petitioner's offenses, the self-defense statute provided:

---

[3](...continued)
to this court, the Petitioner notes that counsel failed to object to these "inaccurate and damaging statements" but makes no argument regarding whether counsel's failure to object amounted to ineffective assistance of counsel. Notwithstanding, we note that on direct appeal, this court concluded that "when [the Petitioner] failed to object to the comments made during closing argument about the lack of a self-defense instruction, that [the Petitioner] was making a tactical decision to rely on a theory that the shooting was an accident." See Jason Osmond Hines, 2011 WL 5966910, at *9. Accordingly, we discern no ineffective assistance of counsel in this regard.

[A] person who is not engaged in unlawful activity and is in a place where such person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

T.C.A § 39-11-611(Supp. 2008) (amended 2009, 2012). Counsel testified that prior to trial he was not aware of the language regarding "unlawful activity" in the statute; however, after learning of the limiting language, he believed that the Petitioner was not entitled to a self-defense instruction because the Petitioner admitted that the shooting occurred during a drug deal with the victim. Accordingly, he shifted his defense strategy to disproving the elements of the State's case and believed that he was successful because the Petitioner was convicted of the lesser-included offenses of second-degree murder and aggravated assault. We note that, of course, the better practice for defense counsel is to familiarize oneself with the relevant statutes prior to trial. Notwithstanding, upon learning of the limiting language in the statute, counsel made the sound tactical decision to forgo further pursuit of a self-defense argument or jury instruction and instead focus on disproving the State's case. Based on the record, we cannot conclude that counsel's decision constituted deficient performance. Cf. State v. Zimmerman, 823 S.W.2d 220, 224 (Tenn. Crim. App. 1991) (concluding that counsel rendered deficient performance "by the peremptory abandonment of the pre-established and *reasonably sound defense strategy*[.]").

Moreover, even if counsel's performance was deficient, the Petitioner failed to establish any prejudice arising therefrom. A general defense, such as self-defense, does not need to be submitted to the jury unless it is "fairly raised by the proof." T.C.A. § 39-11-203(c). "In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001). In the present case, even in the light most favorable to the Petitioner, he was not engaged in lawful activity and, therefore, was not entitled to an instruction on self-defense. See State v. Hawkins, 406 S.W.3d 121, 128 (Tenn. 2013) ("To prevail on a theory of self-defense, a defendant must show that he or she was 'not engaged in unlawful activity' and was 'in a place where the person has a right to be.'"); State v. Zachary Carlisle, No. W2012-00291-CCA-MR3-CD, 2013 WL 5561480, at *18-19 (Tenn.

Crim. App. Oct. 7, 2013) (concluding that the defendant was not entitled to a self-defense instruction because he was engaged in illegal activity, i.e., a drug deal with the victim, at the time of the murder). By his own admission, the Petitioner was engaged in illegal activity, i.e., a drug deal with the victim, at the time of the shooting. Consequently, the Petitioner cannot establish the requisite prejudice prong of Strickland and is not entitled to relief.

## CONCLUSION

Based on the foregoing authorities and analysis, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. McMULLEN, JUDGE

-15-